RUSSELL G. OWENS, JR. and KAY H. OWENS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Owens v. Commissioner
Docket No. 1999-78.
United States Tax Court
T.C. Memo 1981-193; 1981 Tax Ct. Memo LEXIS 549; 41 T.C.M. (CCH) 1312; T.C.M. (RIA) 81193; April 22, 1981. Stanley G. Barr, Jr. and R. Braxton Hill, III, for the petitioners. Michael R. Moore, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency in petitioners' income tax for 1974 in the amount of $ 15,701.58. Respondent in his answer imposed upon petitioners a $ 7,850.79 addition to tax for 1974 under section 6653(b). [1]
Since petitioners failed to take exception to certain items of adjustment, the issues for decision are (1) the amount petitioners are entitled to deduct during 1974 for a *551 charitable contribution of clothing and household furnishings to the Salvation Army and (2) whether petitioners are liable for the addition to tax imposed under section 6653(b) due to their alleged fraud. FINDINGS OF FACT Some of the facts have been stipulated. Except as hereinafter modified, the stipulation and the exhibits attached thereto are incorporated herein by this reference. Russell G. Owens, Jr. (hereinafter referred to as "petitioner") and Kay H. Owens are married. They resided in Virginia Beach, Virginia, at the time the petition in this case was filed. Petitioner is a dentist and during all times relevant to the issues in this case he was engaged in the practice of dentistry. Wilbert A. Klingmeyer (hereinafter referred to as "Klingmeyer") was a certified public accountant during 1973 and 1974 practicing in the Virginia Beach, Virginia, area. He had practiced as a C.P.A. for approximately 29 years when he and petitioner first became acquainted with one another in 1972. In 1973, Klingmeyer was engaged by the owners of the Sunlight Laundry, Norfolk, Virginia, to perform an audit of the corporate books of Blue Bird Laundry Corporation, the owner of Sunlight *552 Laundry, for the purpose of a proposed liquidation sale of the assets of Sunlight Laundry. During the course of Klingmeyer's audit of Blue Bird Laundry Corporation he was offered the opportunity to buy a large quantity of clothing and household furnishings which laundry-dry cleaning customers of Sunlight Laundry had failed to claim. This unclaimed property consisted of approximately two or three rooms full of racks of clothing, rugs and some other household items such as drapes. They were all freshly cleaned, in cellophane bags and included men's, women's and children's clothing. Klingmeyer contacted petitioner at some time during the early fall of 1973 and discussed with him this opportunity to buy a large amount of unclaimed clothing at a favorable price. Klingmeyer proposed that petitioner join him in this venture. Their discussions included the possibility of purchasing the clothing and other items and leaving them at Sunlight Laundry for six months or more, and then disposing of them in a bulk sale, sales through a hired outlet, sales on a retail basis or by donation to a charity. In October, 1973, Klingmeyer purchased the clothing from Sunlight Laundry for $ 503.07 *553 which was 15 percent of the total cleaning charges ($ 3,353.78) outstanding on the unclaimed clothing. All of the items Klingmeyer purchased remained in storage at the Sunlight Laundry premises until March, 1974. On November 7, 1973, Klingmeyer sold to petitioner 50 percent of the clothing that Klingmeyer had purchased from the Sunlight Laundry. On March 22, 1974, petitioner paid Klingmeyer $ 600.00 in respect of his purchase of the clothing on November 7, 1973. Sometime between November 7, 1973, and March 25, 1974, Klingmeyer also sold to Calvin L. Belkov (hereinafter referred to as "Dr. Belkov") 25 percent of the clothing he had purchased from the Sunlight Laundry. By March, 1974, the ownership of the items originally purchased by Klingmeyer from the Sunlight Laundry in October, 1973, was divided as follows: petitioner - 50 percent; Dr. Belkov - 25 percent; Klingmeyer - 25 percent. In March, 1974, petitioner, Klingmeyer and Dr. Belkov were informed by the Sunlight Laundry that the clothing they owned had to be removed from the Sunlight Laundry premises. After being so informed, all three men began to search for places to which the property could be moved. In late March, *554 1974, Klingmeyer contacted the Salvation Army in Norfolk, Virginia, and met with Major James Hipps (hereinafter referred to as "Major Hipps"), who was the commanding officer of the Salvation Army in Norfolk at that time. Klingmeyer requested that the Salvation Army store the clothing in question but was informed that no such storage facilities were available. On March 25, 1974, the clothing and other items owned by petitioner, Klingmeyer and Dr. Belkov were transferred from the Sunlight Laundry facilities to the Salvation Army building in Norfolk, Virginia. All three men were aware that their property was being moved by the Salvation Army to the Salvation Army building, although Klingmeyer was the only erson dealing directly with Major Hipps at that time. The agreement between Klingmeyer and Major Hipps was that the Salvation Army would pick up the clothing, bring it to the Salvation Army building and prepare an itemized list of the property which would be sent to Klingmeyer. Klingmeyer informed petitioner about this arrangement and petitioner expressed his consent to Klingmeyer. The Salvation Army, incurring all the costs of the move, rented a truck, picked up the clothing *555 and other items at the Sunlight Laundry and transported them to their building in Norfolk, Virginia. At that time, Major Hipps signed and issued a "Receipt for Donated Goods" dated March 25, 1974, listing "R. Allen Owens, M.D." as donor and listing "Old Stock, Cleaning Charges $ 3,358.78" as the donated articles. Employees of the Salvation Army spent two days moving the articles and another three days sorting, counting and preparing an itemized list of the property. When the inventory was completed, the clothing and other items were taken to other Salvation Army facilities where they were placed for sale or distributed through the Salvation Army welfare department. On April 5, 1974, the Salvation Army sent a letter to Klingmeyer thanking him for his donation and listing all of the clothing and other items along with the Salvation Army's appraisal of the items donated. Sometime between April 5, 1974, and April 25, 1974, Klingmeyer advised Major Hipps that a significant portion of the items listed in the April 5, 1974, letter to Klingmeyer was attributable to petitioner and Dr. Belkov. On April 25, 1974, the Salvation Army issued a letter to petitioner thanking him for his donation. *556 The letter listed 50 percent of the items previously listed in the April 5, 1974, letter to Klingmeyer and stated the total appraised value of items donated by petitioner as $ 31,683.27. The Salvation Army also issued similar letters dated April 25, 1974, to Klingmeyer and Dr. Belkov listing 25 percent of the items previously listed in the April 5, 1974, letter to Klingmeyer. On May 15, 1974, the April 25, 1974, letter from the Salvation Army addressed to petitioner was taken back to the Salvation Army by petitioner and re-signed by Major Hipps in the presence of a notary public. Petitioner told Major Hipps at that time that he wanted the letter notarized in order to verify that petitioner had in fact contributed the items listed in the letter. This was the first time that Major Hipps met with or talked to petitioner. Prior to this time, Klingmeyer had handled the transaction on behalf of the three owners of the donated property. Petitioners on line 22 of Schedule A attached to their 1974 income tax return claimed a charitable contribution deduction in the amount of $ 31,683.27 for the donation involved herein, with the legend "See attached receipt of 4/27/74 from Salvation *557 Army for clothing donated - detailed in receipt." Petitioners attached to their return a copy of the April 25, 1974, letter from the Salvation Army to petitioner which itemized and appraised the donated articles, and which contained the May 15, 1974, notorized signature of Major Hipps. On August 30, 1977, at the petitioner's request, Major Hipps signed a letter prepared by his secretary and addressed to whom it may concern which stated that the donation of clothing and other items took place on May 15, 1974. On October 13, 1977, Major Hipps signed another letter prepared by his secretary and addressed to petitioner which stated that on or about April 5, 1974, Klingmeyer told Major Hipps that the Salvation Army would be entitled to some compensation for listing, storing and evaluating the articles donated and that they could use or sell some of these items. OPINION This case involves the determination of the amount petitioners may deduct as a charitable contribution during 1974. A further issue for determination is whether petitioners are liable for the 50 percent addition to tax under section 6653(b) due to fraud. On November 7, 1973, petitioner purchased a 50 percent *558 interest in a large amount of clothing and other items from Klingmeyer for $ 600.00. Klingmeyer had previously purchased the clothing and other items from the Sunlight Laundry which was in the process of liquidating. The property petitioner purchased, along with the 25 percent owned by Klingmeyer and the 25 percent owned by Dr. Belkov, remained at the Sunlight Laundry premises until March 25, 1974. At that time the property was transferred to a Salvation Army building in Norfolk, Virginia. Employees of the Salvation Army counted, sorted, appraised and prepared an itemized list of the articles of clothing and household furnishings. The itemized list was sent to Klingmeyer on April 5, 1974, in a letter thanking him for the donation. Thereafter, Klingmeyer informed the Salvation Army of petitioner's and Dr. Belkov's ownership interest in the property. The Salvation Army divided the itemized list according to each owner's interest, i.e. petitioner - 50 percent, Klingmeyer - 25 percent and Dr. Belkov - 25 percent, and sent the respective itemized portions to each of them on April 25, 1974, in letters thanking them for their donations. The appraised value, according to the Salvation *559 Army, of petitioner's portion of the donated property was $ 31,683.27. On May 15, 1974, petitioner had Major Hipps re-sign the April 25, 1974, letter before a notary public. Petitioners deducted $ 31,683.27 on their 1974 income tax return as a charitable contribution to the Salvation Army. Respondent determined that petitioners' deduction for this contribution was limited to $ 600.00 since the property was not held for more than six months by petitioners. The basic question we must decide in resolving the issue concerning the proper amount of petitioners' charitable contribution deduction is when the gift was made. The parties agree that a contribution of clothing and other items to the Salvation Army was made by petitioners during the year in issue; they disagree as to when the actual donation was made. Petitioners contend that the donation occurred on May 15, 1974, at which time petitioner alleges he decided upon his intention to make a gift and had Major Hipps re-sign an itemized list of the articles donated before a notary public. Respondent contends that the donation was made on or before April 5, 1974, at which time the property was placed beyond the dominion and control *560 of petitioner and the gift was allegedly completed. Section 170(a) allows as a deduction any charitable contribution payment of which is made within the taxable year for which it is claimed. It is beyond question that petitioners made a charitable contribution in 1974 to the Salvation Army and that the Salvation Army qualifies as a charitable organization under section 170(c)(2)(B). Ordinarily, when a charitable contribution of property other than money is made, as in the instant case, the amount of the deduction to which the donor is entitled is the fair market value of the property at the time of the donation. Section 1.170A-1(c), Income Tax Regs. However, section 170(e)(1)(A) provides that the amount of any charitable contribution of property shall (for periods after December 31, 1969) be reduced by the amount of gain which would not have been long-term capital gain if the property contributed had been sold at its fair market value at the time of the contribution. "Long-term capital gain" for the taxable year in issue was denied in section 1222(3) as gain from the sale or exchange of a capital asset held for more than six months. The clothing and other items here in issue *561 constituted a capital asset in the hands of petitioner. Thus, the date of the gift is determinative of the amount of petitioners' charitable contribution deduction. If the donation occurred at a time when petitioner held the property for more than six months, the amount of the deduction is the fair market value of the property at the time of the contribution. On the other hand, if the donation occurred when the property was held for six months or less, the amount of the deduction is limited to petitioners' cost basis in the property. Section 170(e)(1)(A), section 1.170A-4(a)(1) Income Tax Regs.
Petitioner acquired his interest in the property in issue On November 7, 1973, for a price of $ 600.00. Therefore, the critical date in this case is May 7, 1974, which is six months after the date of acquisition. Ordinarily, a charitable contribution is made at the time delivery is effected. Section 1.170A-1(b) Income Tax Regs. The delivery of the property in the instant case occurred on March 25 and 26, 1974. Where the contribution is in the form of property other than money, the contribution is considered made on the date upon which the gift of the property is completed. Pauley v. United States, 459 F.2d 624 (9th Cir. 1972). *562 To constitute a completed gift of property the subject-matter must be placed beyond the dominion and control of the donor. Pauley v. United States, supra; see Sandford's Estate v. Commissioner of Internal Revenue, 308 U.S. 39 (1939); Estate of Holtz. v. Commissioner of Internal Revenue, 38 T.C. 37 (1962). Based on the facts of this case, we are convinced that when the clothing and other items were transferred to the Salvation Army facility in Norfolk, Virginia, on March 25 and 26, 1974, petitioner relinquished dominion and control over the property so as to place it beyond recall. Indeed, the facts indicate that once the property was inventoried and appraised it was moved to other Salvation Army stores where it was placed for sale or distribution. This occurred on or before April 5, 1974. Petitioners argue, however, that Klingmeyer had no authority to donate petitioner's property to the Salvation Army, that there were conditions imposed upon the transfer of the property to the Salvation Army which had to be fulfilled before there could be a completed gift and that under Virginia law an essential element of a gift is donative *563 intent which petitioner lacked until May 15, 1974. In Virginia the three essential elements for completion of a gift are intent, delivery and acceptance. Rust v. Phillips, 208 Va. 573, 159 S.E.2d 628 (1968); Taylor v. Smith, 199 Va. 871, 102 S.E.2d 160 (1958). Although the presence of donative intent involves an inquiry into petitioner's subjective intentions, we will not rely solely upon petitioner's testimony but must consider all the facts and circumstances surrounding the transaction in making our determination. Major Hipps testified that when Klingmeyer contacted the Salvation Army in March, 1974, Major Hipps told him that the Salvation Army could not store such a large quantity of clothing and other articles. Both Major hipps and Klingmeyer testified that the substance of their agreement was that the Salvation Army would pick up the clothing at the Sunlight Laundry, move it to a Salvation Army building, prepare an itemized list of the property and send the list to Klingmeyer. Klingmeyer knew that once the property was itemized by the Salvation Army it would be disposed of through sales or distributions at other Salvation Army locations. *564 Klingmeyer discussed this arrangement with petitioner who consented to it before the clothing was moved. We find that, notwithstanding petitioner's testimony to the contrary, he authorized Klingmeyer to act as his agent regarding this transaction with the Salvation Army. [2] It is a well known fact that the Salvation Army is a charitable organization. We think it is unlikely that petitioner or Klingmeyer believed that the Salvation Army would spend the time, effort and money involved in moving, itemizing and appraising the clothing and other items unless a charitable donation were intended. Indeed, Major Hipps testified that he told Klingmeyer that the Salvation Army would not take possession of the property unless it was donated. *565 Other facts in the record also indicate that petitioner donated the property before May 7, 1974. Although petitioner did not deal directly with the Salvation Army, Klingmeyer, once petitioner consented to the Salvation Army transaction, was acting on behalf of petitioner. The only condition imposed on the transfer of the clothing was that the Salvation Army prepare an itemized list and send it to Klingmeyer. A gift given subject to the donee's compliance with certain conditions does not take effect until the donee agree to so comply and accepts the gift. Gagne v. Commissioner, 16 T.C. 498 (1951). On April 5, 1974, the Salvation Army sent an itemized list to Klingmeyer along with a letter thanking him for the donation. Thus, on April 5, 1974, the gift was accepted and the conditions to the gift complied with. This is the date upon which the gift was completed. After being informed that petitioner and Dr. Belkov were also contributors of the property, the Salvation Army sent both of them letters, each dated April 25, 1974, itemizing the articles contributed and thanking them for their donations. Petitioner never objected to the letter or the contribution at *566 any time before May 7, 1974. When petitioner had Major Hipps re-sign the itemized list on May 15, 1974, it was only to verify the donation which had already been made. After examining the evidence in this case, we feel that petitioner has failed to satisfy his burden of proving that he lacked the intent to make a gift before May 7, 1974. We hold that petitioner made a completed gift of his property to the Salvation Army on April 5, 1974. Therefore, petitioner did not hold the property contributed for more than six months and the deduction under section 170(a) must be reduced by the amount which would not have been long-term capital gain if the property had been sold at its fair market value at the time of the contribution. Section 170(e)(1)(A). Petitioners are entitled to deduct $ 600 for their charitable contribution to the Salvation Army in 1974. The remaining issue for decision is whether any part of petitioners' underpayment of taxes was due to fraud, subjecting them to the addition to tax under section 6653(b). The respondent has the burden of proving by clear and convincing evidence that some part of the underpayment for 1974 was due to fraud.Section 7454(a); Rule *567 142(b), Tax Court Rules of Practice and Procedure. It must be demonstrated that the taxpayer intended to evade taxes which he knew or believed he owed by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002 (3rd Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner, 26 T.C. 107 (1956). The issue of fraud involves a question of fact which requires an examination of the entire record. Mensik v. Commissioner, 328 F.2d 147 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner, 53 T.C. 96 (1969). Respondent cannot rely solely on the normal presumption of correctness which attaches to his deficiency determination to satisfy his evidentiary burden on the fraud issue. There must be additional independent evidence from which fraud can be inferred. The taxpayer's failure to satisfy his burden of proof as to the incorrectness of the deficiency *568 does not establish fraud. Drieborg v. Commissioner, 225 F.2d 216 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court. In the instant case, respondent alleges that petitioners claimed a charitable contribution deduction on their 1974 income tax return for clothing and other items donated to the Salvation Army to which they knew they were not entitled. Petitioners, as we have found, are entitled to a deduction for such contribution even though the proper aount of the deduction is their cost basis in the property rather than its fair market value. Section 170(e) was amended by section 201(a)(1), Tax Reform Act of 1969, Pub.L. 91-172, 83 Stat. 487, 549, to apply to contributions such as the contribution at issue here made after December 31, 1969. The 1969 amendments substantially complicated section 170(e), and we are therefore somewhat reluctantly willing to accord petitioners and benefit of doubt that they claimed a fair market value deduction on their return under the mistaken apprehension that they were entitled to such deduction. Although we have rejected their arguments concerning the date on which the gift was completed, this *569 does not necessarily mean that respondent has ultimately proved fraud by clear and convincing evidence. There is nothing, after all, fraudulent in attempting to reduce taxes by claiming a deduction honestly but erroneously believed to be legally permissible. Rogers Recreation Co. of Connecticut v. Commissioner, 103 F.2d 780 (2nd Cir. 1939). Respondent also imposed the fraud penalty on the grounds that petitioners submitted two letters which were known to be false to agents during the audit process in an attempt to justify the deductions. Major Hipps testified at trial that both letters were prepared by his secretary, one on August 30, 1977, and the other on October 13, 1977 and that he personally signed both. Major Hipps equivocated as to his belief in the truth of some of the statements in these letters, testifying that he did not read the letters at the time he signed them. Although petitioners' attempts to support the deduction after it was claimed may be characterized as approaching the not always clear dividing line between overzealous advocacy of one's position and fraudulent conduct, we conclude that their conduct in this instance does not clearly evidence *570 fraudulent intent. We therefore hold that the respondent has failed to produce clear and convincing evidence demonstrating that part of the underpayment in tax was due to petitioners' fraud or that petitioners acted fraudulently, and that petitioners are therefore not liable for the addition to tax under section 6653(b). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise specifically indicated.↩
2. Stipulation 13 submitted by the parties states that "In late March, 1974, Mr. Klingmeyer, acting on his own behalf and as the agent of Messrs. Owens and Belkov, contacted the Salvation Army in Norfolk, Virginia, and met with Major James Hipps, who was the commanding officer of the Salvation Army in Norfolk at that time." Under Rule 91, Tax Court Rules of Practice and Procedure↩, a stipulation generally is treated as a conclusive admission by the parties of the matter stipulated, regardless of whether it involves fact or the application of law to fact. Nevertheless, petitioners argue that justice requires the Court to permit them to strike stipulation 13 because petitioners did not authorize the attorney who represented them at the initial trial of this case to make such stipulation. By Order of this Court dated May 15, 1980, the words, "acting on his own behalf and as the agent of Messrs. Owens and Belkov," was expunged from paragraph 13 of the Stipulation of Facts, and the record was reopened to permit Dr. Owens to testify regarding W.A. Klingmeyer's agency relationship with Dr. Owens and to permit respondent to introduce any additional rebuttal evidence on this issue. Accordingly, we have reached our decision in this case independently of any reliance upon stipulation 13.